The following constitutes the
Memorandum Decision of the Court.
Signed February 11, 2014

Roger L. Efremsky
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

In re:

MORTGAGE FUND '08 LLC,

    Debtor.

_____/

SUSAN L. UECKER,
Trustee of the Mortgage
Fund '08 Liquidating Trust,

    Plaintiff,

  vs.

WELLS FARGO CAPITAL
FINANCE, LLC,

    Defendant.

_____/

Bankruptcy Case No. 11-49803 RLE

Chapter 11

Adv. Proc. No. 12-4137 RLE

**MEMORANDUM DECISION RE MOTION
TO DISMISS THIRD AMENDED COMPLAINT
WITHOUT LEAVE TO AMEND**

*12-4137 Memo. Decis.*                    -1-

## I. INTRODUCTION

Before the Court for decision is the Motion to Dismiss by defendant Wells Fargo Capital Finance ("Wells Fargo") regarding the Third Amended Complaint (the "Complaint") filed by plaintiff Susan L. Uecker, in her capacity as the Liquidating Trustee of the Mortgage Fund '08 Liquidating Trust (the "Trustee" and "MF08"). The matter has been fully briefed and argued.

The only claim alleged in the Complaint is for aiding and abetting a pre-petition breach of fiduciary duty which is based on California law. The claim does not arise under title 11, and did not arise in the bankruptcy case of MF08 and is thus not a core proceeding under 28 U.S.C. § 157(b)(2).[1] The claim is related to the chapter 11 case of MF08 and the Court may decide it on its merits. 28 U.S.C. § 1334(b); Montana v. Goldin (In re Pegasus Gold Corp.), 394 F.3d 1189 (9th Cir. 2005). To the extent any party takes the position that this Court may not enter a final order in this matter, the Court deems this Memorandum Decision a report and recommendation to the district court. 28 U.S.C. § 157(c).

## II. DISCUSSION

### A. Standard for Dismissal under Rule 12(b)(6)

The standard for dismissal of a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6),

---

[1] The Complaint's reference to 28 U.S.C. § 157(b)(2)(H) appears to be left over from prior versions of the complaint which alleged fraudulent conveyance claims.

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 2 of 28

applicable here by Federal Rule of Bankruptcy Procedure 7012, is familiar to the parties and does not warrant extensive discussion.

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2), applicable here by Fed. R. Bankr. P. 7008. Detailed factual allegations are not required to survive a Rule 12(b)(6) motion, but a complaint must allege sufficient facts to raise a right to relief above the speculative level. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

In evaluating this Rule 12(b)(6) motion, the Court engages in a two-step analysis. First, the Court accepts as true all non-conclusory, factual allegations made in the Complaint. Based upon these allegations, the Court draws all reasonable inferences in favor of the Trustee. Second, after accepting as true all non-conclusory allegations and drawing all reasonable inferences in favor of the Trustee, the Court determines whether the Complaint alleges a plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Despite the liberal pleadings standards of Rule 8, conclusory allegations will not save a complaint from dismissal. Id., at 678. A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id., at 678. If there are two alternate explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are plausible, a complaint will survive a motion to dismiss under Rule 12(b)(6); a complaint may be dismissed only when a defendant's plausible

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 3 of 28

alternative explanation is so convincing that plaintiff's
explanation is implausible. Starr v. Baca, 652 F.3d 1202, 1216
(9th Cir. 2011).

The Complaint refers to and relies on the Note Purchase
Agreement (the "Note Purchase Agreement") and the Confidential
Offering Memorandum ("Offering Memorandum") between MF08 and its
investors and the Loan and Security Agreement (the "Loan
Agreement") between Wells Fargo and RE Loans, LLC ("RE Loans").
These documents are exhibits to Wells Fargo's Memorandum in
support of its Motion to Dismiss. Docket no. 75, Ex. 1-3.

The Court may consider evidence on which the Complaint
necessarily relies if (1) the complaint refers to the document;
(2) the document is central to the plaintiff's claim; and (3) no
party questions the authenticity of the copy attached to the Rule
12(b)(6) motion. Branch v. Tunnell, 14 F.3d 449, 453-54 (9th Cir.
1994), rev'd on other grounds by Galbraith v. County of Santa
Clara, 307 F.3d 1119 (9th Cir. 2002). The Complaint relies on
these three documents, they are central to the Trustee's claim
and their authenticity is not questioned. Accordingly, the Court
will treat them as part of the Complaint and will assume their
contents are true for present purposes. United States v. Ritchie,
342 F.3d 903, 908 (9th Cir. 2003).

**B. Essential Allegations of the Complaint**

The parties are familiar with the background of this case
and the allegations of the Complaint so they will not be repeated
in great detail.

The Complaint alleges that MF08 was owned and managed by the
Mortgage Fund, LLC, (the "Mortgage Fund" or the "Manager") and

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 4 of 28

that individuals Walter Ng and Kelly Ng owned and controlled the Mortgage Fund. Compl. ¶ 15. The Complaint also alleges that Walter and Kelly Ng controlled MF08's affiliated entities, including RE Loans and B-4 Partners, LLC. Compl. ¶¶ 16-20.[2]

The story alleged in the Complaint is that Walter Ng and other Ng family members formed RE Loans to make secured loans to real estate developers, raising funds by selling unregistered equity interests to investors who initially became members of RE Loans. Compl. ¶ 16. RE Loans operated successfully for several years, paying consistent returns to its investors until 2007. At that point, RE Loans was advised by its attorneys that it was violating state and federal securities laws and could not accept new money from investors. At the same time, the real estate market began to struggle and RE Loans' borrowers began to under-perform, putting RE Loans in a liquidity crisis. Compl. ¶¶ 26-28.

To solve its liquidity crisis, in July 2007, RE Loans obtained a $65 million line of credit from Wells Fargo, pursuant to which RE Loans gave Wells Fargo a first priority security interest in its secured loans as collateral. Compl. ¶¶ 31-33. In October 2007, RE Loans created MF08 with a stated purpose of making secured loans to real estate developers, and MF08 began soliciting investors, as RE Loans had, with promised returns of 8% or more per year all as described in the Offering Memorandum and as governed by the Note Purchase Agreement. Compl. ¶¶ 39-41.

The Complaint alleges that the "true purpose" of MF08 was to

---

[2] RE Loans filed its chapter 11 case in September 2011 in the Northern District of Texas. Case no. 11-35865.

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 5 of 28

"funnel investors' money from MF08 to RE Loans" which it
immediately began to do, and in its "creation and operation" it
was a fraudulent scheme in which the managers of RE Loans and
MF08 used new investors' money (from MF08) to pay old investors'
purported returns (from RE Loans) and pay Wells Fargo substantial
fees and interest. Compl. ¶¶ 8, 12, 46, 79, 83. Between December
2007 and April 2009, as part of this "scheme," MF08 raised $80
million from investors and transferred $66 million to RE Loans
and received underperforming or defaulted loans of a lower value
in return. Compl. ¶¶ 5-9, 46.

The Complaint alleges that Wells Fargo learned that MF08 had
transferred cash to RE Loans - designated as an unsecured loan -
when it received RE Loans' financial statement for the last
quarter of 2007 in February 2008. Compl. ¶¶ 49-52. Following this
discovery, Wells Fargo reviewed MF08's governing documents, and
insisted that RE Loans cure what was a default under its Loan
Agreement. RE Loans then sold three real estate secured notes to
MF08 to eliminate the unsecured indebtedness and cure the default
under the Loan Agreement (the "Initial Note Sales"). The
Complaint alleges this involved "backdating" these sales to make
it appear they had taken place on earlier dates. Compl. ¶¶ 52,
54, 56, 58, 66. RE Loans later transferred other real estate
secured notes to MF08 in exchange for subsequent cash transfers
(the "Subsequent Note Sales"). Compl. ¶¶ 71-74. The Complaint
alleges the Initial Note Sales and the Subsequent Note Sales
violated the terms of the Note Purchase Agreement between MF08
and its investors and resulted in the depletion of substantially
all of MF08's assets, leading to its bankruptcy filing. Compl. ¶¶

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 6 of 28

51-52, 75.

The Complaint alleges that Wells Fargo knew that the Manager was breaching its fiduciary duty to MF08 as of February 2008 and then knowingly assisted the Manager in accomplishing this "scheme" to deplete MF08 of its assets. Compl. ¶¶ 46, 68. Between December 2007 and April 2009, approximately $66 million was transferred by MF08 to RE Loans in exchange for real estate secured notes which the Complaint alleges were worth far less than that. The Trustee is seeking to recover an unspecified amount of compensatory and punitive damages. Compl. ¶¶ 18, 51, 77, 85, 86.

**C. Wells Fargo's Arguments for Dismissal of the Complaint**

Wells Fargo contends that the Complaint should be dismissed without leave to amend because the allegations of the Complaint show that the affirmative defense of *in pari delicto* precludes the Trustee's case against Wells Fargo. Alternatively, Wells Fargo contends that the Complaint should be dismissed without leave to amend because it does not - and cannot - adequately plead the aiding and abetting breach of fiduciary duty claim. Wells Fargo argues that the Complaint does not allege facts plausibly showing that Wells Fargo had the requisite knowledge or provided the requisite substantial assistance to the Manager in depleting MF08 of its assets.

**D. Trustee's Arguments against Dismissal of the Complaint**

The Trustee contends that the *in pari delicto* defense can not be decided on a motion to dismiss because it involves factual issues. The Trustee also contends that the defense should not apply to her as a matter of equity or policy, and that the

*12-4137 Memo. Decis.*                    -7-

1 Complaint does plead all that is required to state a plausible
2 claim for aiding and abetting breach of fiduciary duty.

### E. *In Pari Delicto* Affirmative Defense

#### 1. Preliminary Matters

5 The Court first disposes of several preliminary matters
6 regarding use of this affirmative defense. First, California law
7 governs the aiding and abetting breach of fiduciary duty claim
8 and this affirmative defense. Second, this affirmative defense
9 may provide a basis to dismiss a complaint when its required
10 elements (as defined by applicable state law) are clear on the
11 face of the pleading. Peregrine Funding, Inc. v. Sheppard Mullin
12 Richter & Hampton, LLP, 133 Cal. App. 4th 658, 681 (Ct. App.
13 2005) (applying California law, court finds claims should have
14 been stricken where bankruptcy trustee plaintiff's own pleadings
15 contained admissions that established basis for defense); In re
16 Crown Vantage, Inc., 2003 WL 25257821, at *6-11 (N.D. Cal. Sept.
17 25, 2003, aff'd, 198 F.App'x 597 (9th Cir. 2006) (applying
18 defense under California, New York and Virginia law as to
19 bankruptcy trustee, noting similarity of each states' law,
20 dismissing certain claims). The Trustee's categorical argument to
21 the contrary is incorrect.

22 Third, the affirmative defense may be asserted against a
23 bankruptcy trustee (or a liquidating trustee) as Crown Vantage
24 and Peregrine Funding indicate. Crown Vantage, 2003 WL 25257821
25 at *5; Peregrine Funding, 133 Cal. App. 4th at 665; see also,
26 Baena v. KPMG LLP, 453 F.3d 1 (1st Cir. 2006) (litigation trustee
27 appointed under liquidation plan); Picard v. JPMorgan Chase Bank
28 & Co. (In re Bernard L. Madoff Inv. Sec. LLC), 721 F.3d 54 (2d

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 8 of 28

Cir. 2013) (SIPA trustee vested with powers of bankruptcy trustee); Official Comm. v. R.F. Lafferty & Co., Inc., 267 F.3d 340 (3d Cir. 2001) (committee acting on behalf of bankruptcy trustee).

The Trustee's reliance on dicta in FDIC v. O'Melveny & Myers, 969 F.2d 744 (9th Cir. 1992), rev'd, 512 U.S. 79 (1994) is misplaced. The Trustee argues this case holds that a bankruptcy trustee, like a receiver appointed by a state court, is not a party to the alleged inequitable conduct and is not subject to the equitable defenses that could be asserted against its wrongdoing predecessors. The case holds no such thing. See Schnelling v. Thomas (In re Agribiotech, Inc.), 2005 WL 4122738, *7-8 (D. Nev. 2005) (explaining O'Melveny, noting Ninth Circuit had no occasion to consider Bankruptcy Code § 541(a)(1) because case involved receiver appointed by FDIC and § 541(a)(1) displaces state law for determining force of state law defenses against bankruptcy trustee); Crown Vantage, 2003 WL 25257821 at *6 (noting O'Melveny dicta equating receivers and bankruptcy trustees is inconsistent with Ninth Circuit precedent).

The liquidating trust under which the Trustee acts was created to dispose of property transferred to it by MF08 and resolve claims pursuant to the terms of MF08's confirmed plan.[3] The Trustee is the successor to MF08. Under Bankruptcy Code § 541(a)(1) the "property of the estate" includes all "legal or equitable interests of the debtor in property as of the commencement of the case." Section 541 thus requires that courts

---

[3] MF08 Main Case, Docket no. 101-1.

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 9 of 28

analyze defenses to claims asserted by a trustee as they existed at the commencement of the case and later events, such as the ouster of a wrongdoer, are not taken into account. Peregrine Funding, 133 Cal. App. 4th at 680 (citing Lafferty, 267 F.3d at 356-57). Accordingly, a trustee bringing a cause of action it holds as property of the estate is subject to the same defenses that could be asserted by a defendant if such a cause of action were being brought by the debtor itself. To the extent defenses are available under the nonbankruptcy law under which the cause of action lies, they may be asserted against a trustee.

## 2. Application to the Complaint

Under California law, the *in pari delicto* defense bars one participant in an unlawful act from recovering damages from another participant in the unlawful act. Casey v. U.S. Bank Nat'l Ass'n, 127 Cal. App. 4th 1138 (Ct. App. 2005) (noting doctrine applies when guilt of corporate officers can be imputed to corporation); Peregrine Funding, 133 Cal. App. 4th at 679 (citing Casey and Lafferty for imputation analysis); Golden State TD Inv., LLC v. Andrews Kurth LLP (In re Cal. TD Inv. LLC), 489 B.R. 124, 129 (Bankr. C.D. Cal. 2013) (noting California follows "well established principle" that the acts and knowledge of an officer/agent can be attributed to a corporation/principal as an application of more general agency law). In short, if the misconduct of the Mortgage Fund can be imputed to MF08 itself, it is, by extension, imputed to the Trustee and will bar the claim asserted in the Complaint.

As explained in Crown Vantage, the *in pari delicto* doctrine will apply where (1) agents of the plaintiff have participated in

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 10 of 28

the wrongdoing for which the corporate entity seeks to recover;
(2) if the agents were acting in a manner adverse to the
interests of the corporate entity, the so-called adverse interest
exception will apply so the actions of the agent are not imputed
to the corporate entity; (3) even if the agents of the corporate
entity were acting in a manner adverse to its interests, where
the agents and corporate entity are one and the same, the sole
actor exception applies with the result that the *in pari delicto*
doctrine will bar the claim. <u>Crown Vantage</u>, 2003 WL 25257821 at
*7.

Neither party argues that the first of these three elements
is an issue and the allegations of the Complaint would preclude
this argument. As to the second element, the Trustee argues that
the adverse interest exception applies here because the Complaint
alleges MF08 was "looted" by its Manager for the benefit of RE
Loans. The Trustee contends that MF08 was not used to defraud its
investors, but was itself defrauded by the Mortgage Fund. While
the Complaint does allege that Walter and Kelly Ng "perpetrated a
devastating financial fraud scheme that damaged MF08 and its
creditors," it also alleges that MF08 - in its creation and
operation - was a fraudulent scheme in which RE Loans and MF08
used new investors' money to pay old investors' returns and to
pay Wells Fargo fees and interest. It also alleges that MF08's
"true purpose was to funnel money" to RE Loans to keep it
solvent. Compl. ¶¶ 8, 12, 46, 79.

Was MF08 a participant in this alleged fraud or was it a
victim of it? The Complaint does allege that MF08 was "looted"
which tends to support the Trustee's argument that the adverse

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 11 of
28

interest exception would apply here. However, the Complaint also alleges that there was only one actor involved – MF08's only owner, only member, and only manager, the Mortgage Fund, which was, in turn, owned and controlled by Walter and Kelly Ng. Compl. ¶¶ 12, 15, 19.

The question is thus whether the sole actor exception applies here. The Trustee's opposition to Wells Fargo's motion to dismiss does not address the sole actor exception. For obvious reasons, Wells Fargo stresses that it applies here relying, *inter alia*, on Lafferty and Peregrine Funding.

In Lafferty, the creditor's committee (standing in for the trustee) argued that the individuals who owned, controlled, and dominated the debtor had acted adversely to the debtor, precluding use of the unclean hands defense. In rejecting the committee's argument, the Third Circuit explained:

> The general principle of the "sole actor" exception provides that, if an agent is the sole representative of a principal, then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's conduct was adverse to the principal's interests. The rationale for this rule is that the sole agent has no one to whom he can impart his knowledge, or from whom he can conceal it, and that the corporation must bear the responsibility for allowing an agent to act without accountability.

Lafferty, 267 F.3d at 359 (internal citations omitted).

In Peregrine Funding, the complaint alleged that one individual owned, controlled, and made decisions for the debtor entity. Relying on Lafferty, the court found that his fraud was properly imputed to the debtor for purposes of the *in pari delicto* defense. Peregrine Funding, 133 Cal. App. 4th at 680; see also, Cal. TD Inv. LLC, 489 B.R. at 131 (collecting cases, noting different formulations of sole actor exception but acknowledging

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 12 of 28

that without sole ownership, sole control is required, declining

to grant summary judgment on *in pari delicto* grounds where

factual issues regarding ownership were raised).

The Complaint alleges that Walter and Kelly Ng, the sole

relevant decision makers, were also the sole owners of the

Mortgage Fund which was the sole owner and sole member of MF08.

Accordingly, the allegations of the Complaint show that the sole

actor exception applies here as it did in <u>Lafferty</u> and <u>Peregrine</u>

<u>Funding</u>.[4]

The *in pari delicto* defense bars the Trustee's aiding and

abetting breach of fiduciary duty claim against Wells Fargo.

Because amendment would be futile, the Motion to Dismiss will be

granted without leave to amend. <u>Steckman v. Hart Brewing, Inc.</u>,

143 F.3d 1293, 1298 (9th Cir. 1998).

**F. Aiding and Abetting Breach of Fiduciary Duty**

Wells Fargo also argues that the Complaint fails to state a

claim for relief for aiding and abetting breach of fiduciary

duty.[5] The Court agrees.

In order to state a claim for aiding and abetting breach of

fiduciary duty, the Complaint must plausibly allege that Wells

_____

[4] In an effort to defeat this sole actor argument, the
Trustee's Opposition to the Motion to Dismiss argues that certain
provisions of the MF08 operating agreement gave some level of
control to MF08 noteholders. The Complaint alleges sole ownership
by the Manager which makes this belated suggestion that sole
control was lacking irrelevant. <u>See</u> <u>Cal. TD Inv. LLC</u>, 489 B.R. at
132 (noting that in absence of sole ownership, sole actor
exception requires sole control).

[5] Delaware law defines the scope of the duty owed by the
Manager to MF08. <u>See</u> CAL. CORP. CODE § 17450(a).

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 13 of 28

Fargo had actual knowledge of the specific primary wrong being committed by the Mortgage Fund - here, stripping MF08 of substantially all of its assets. And it must plausibly allege that Wells Fargo made a conscious decision to provide substantial assistance to the Mortgage Fund to accomplish this. <u>Casey</u>, 127 Cal. App. 4th at 1145-46 (discussing history of cause of action under California law and sustaining demurrer because allegations of knowledge were insufficient, noting complaint must show defendant knows what the tort is, must act with intent of facilitating commission of it, and must have knowledge of the object to be attained by it); <u>Neilson v. Union Bank of California, N.A.</u>, 290 F. Supp. 2d 1101, 1119 (C.D. Cal. 2003) (allegations of atypical banking procedures and banks' unusual assistance supported inference of banks' knowledge where Ponzi scheme operator used banks in scheme's operation); <u>In re Sharp Int'l Corp.</u>, 281 B.R. 506, 515 (Bankr. E.D.N.Y. 2002), <u>aff'd</u>, 403 F.3d 43 (2d Cir. 2005) (allegations of knowledge insufficient, suspicion and surmise do not constitute actual knowledge); <u>Henry v. Lehman Commercial Paper, Inc. (In re First Alliance Mortg. Co.)</u>, 471 F.3d 977, 993-95 (9th Cir. 2006) (actual knowledge requires more than a vague suspicion of wrongdoing).

While Fed. R. Civ. P. 9(b) (applicable here by Fed. R. Bankr. P. 7009) permits knowledge to be alleged generally, and actual knowledge may be inferred (and proven by circumstantial evidence), the allegations of knowledge must still satisfy the pleading requirements set forth in <u>Twombly</u> and <u>Iqbal</u>. <u>Calvert v. Zions Bancorporation (In re Consolidated Meridian Funds)</u>, 485 B.R. 604, 617 (Bankr. W.D. Wa. 2013).

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 14 of 28

Ordinary business transactions may satisfy the substantial assistance element of an aiding and abetting claim if Wells Fargo actually knew those ordinary transactions assisted the commission of the specific tort. Casey, 127 Cal. App. 4th at 1145; First Alliance Mortg., 471 F.3d at 995.

### 1. Actual Knowledge

Wells Fargo contends that the Complaint fails to state a claim for relief because it does not include any non-conclusory factual allegations from which to draw a plausible inference that Wells Fargo actually knew MF08's financial condition, actually knew that the Manager was transferring substantially all of MF08's assets to RE Loans, and actually knew that these transfers were causing MF08 severe financial detriment.

The Trustee contends that the Complaint sufficiently alleges how Wells Fargo acquired the requisite actual knowledge of MF08's financial condition and the activities that amounted to the breach of fiduciary duty: (1) through what it knew about RE Loans as its borrower and the control given by its Loan Agreement (Compl. ¶¶ 31-38); (2) through reviewing MF08's governing documents (i.e., the Note Purchase Agreement and the Offering Memorandum) after learning that MF08 had made unsecured loans to RE Loans in February 2008 (Compl. ¶¶ 48-53); and (3) through the fact that two of MF08's bank accounts were at a subsidiary of a bank acquired by Wells Fargo's parent through a merger completed in 2007 (Compl. ¶¶ 43, 51). The Court will consider each of these in turn.

//

//

*12-4137 Memo. Decis.*                    -15-

**a. The Loan Agreement between Wells Fargo and RE Loans**

The Trustee's first theory for actual knowledge is based on allegations regarding the terms of the Loan Agreement between Wells Fargo and RE Loans.

For example, § 2.6 called for establishing a lockbox account; § 6.3(a) and (b) required RE Loans to report financial information on a monthly or quarterly basis; § 7.13 restricted RE Loans' transactions with its affiliates unless they met certain criteria, including fair and reasonable terms, and prior notice was given to Wells Fargo. Compl. ¶¶ 31–38. The Complaint alleges that by these provisions "Wells Fargo obtained full knowledge of and approved the fraudulent scheme to funnel MF08 cash to RE Loans including that the transfers made pursuant to that scheme were substantially all of the assets of MF08 and were to MF08's severe financial detriment by at least early February 2008. In order to approve the transactions pursuant to the terms of the Loan Agreement, Wells Fargo evaluated the fairness and reasonableness of the terms of those transactions and became aware of the financial detriment to MF08 caused by such transactions and the breaches of fiduciary duty committed by the managers of MF08." Compl. ¶ 35.

The Loan Agreement does not provide a basis from which the Court may draw a plausible inference regarding Wells Fargo's knowledge of the Manager's breach of its fiduciary duty to MF08.

As relevant here, the Loan Agreement defined "Permitted Dispositions" as "a sale of a Note Receivable . . . for a cash price of not less than eighty [percent] (80%) of the unpaid balance thereof so long as any proceeds payable to any Borrower

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 16 of 28

are made directly to a cash management account." Loan Agreement, p. 15. Section 7.13(a) provided that "except for Permitted Dispositions," RE Loans will not "sell or otherwise dispose of any of its property to any Affiliate."

The Complaint repeatedly alleges that the notes were sold for "face value" or "par value." Compl. ¶¶ 12, 52, 65. Accordingly, Wells Fargo had no obligation to analyze the fairness or reasonableness of the terms of the transactions as alleged in the Complaint, nor did it have to give prior written consent. It had only to verify that at least 80% of the face amount was paid and the Complaint alleges that it was. Section 4.9(b) of the Loan Agreement required Wells Fargo to release its lien on notes sold in accordance with the Loan Agreement's terms.

Based on the foregoing, the terms of the Loan Agreement do not provide a basis for plausible allegations that Wells Fargo knew - directly or inferentially - of MF08's financial condition or the Manager's breach of its fiduciary duty. The inferences the Trustee asks the Court to accept are unwarranted.

### b. The Note Purchase Agreement and Offering Memorandum

The Trustee's second theory for knowledge is based on allegations that Wells Fargo reviewed the Note Purchase Agreement and Offering Memorandum and from this review learned of MF08's financial condition, learned that MF08 was breaching the terms of Note Purchase Agreement, and learned that MF08's transfers to RE Loans were causing severe financial detriment to MF08 in breach of the Manager's fiduciary duty to MF08.

As to the Initial Note Sales, the Complaint alleges that Wells Fargo learned in February 2008 that MF08 had made unsecured

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 17 of 28

loans to RE Loans which was an event of default under the Loan Agreement. Compl. ¶¶ 49-52. Wells Fargo then "demanded" that the problem be fixed by making those loans appear to be purchases by MF08 of three secured real estate loans from RE Loans and participated in a scheme to backdate these transactions. Compl. ¶¶ 44, 56. The Complaint alleges that Wells Fargo participated in this scheme to sell the three non-performing loans to MF08 at face value, knowing that the value of underlying real estate was less than the face amount of these three loans, and knowing that the sales violated the related party lending criteria set forth in the Note Purchase Agreement in that no current appraisals existed for these properties, the loan to value ratio exceeded 50%, and that the amounts loaned vastly exceeded the 20% restriction on loans to related parties. Compl. ¶¶ 65, 66, 68, 69.

As to the Subsequent Note Sales, the Complaint alleges that MF08 continued to transfer cash to RE Loans, and RE Loans, with Wells Fargo's knowledge and assistance, continued to sell its non-performing or defaulted loans to MF08 with the same sort of violations of the terms of the Note Purchase Agreement. Compl. ¶¶ 70-75.

Several provisions of the Note Purchase Agreement are implicated by these allegations. First, § 5.1(a) defines RE Loans and MF08 as affiliates. Second, § 5.1(c) defines RE Loans as a "Sponsored Investment Fund." The Trustee's knowledge theory for the Initial Note Sales rests on § 5.7(e) dealing with "Loans to Related Parties." The section defines the term "Related Party Loan" as a loan made by MF08 in which the borrower is an

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 18 of 28

affiliate. It then provides certain conditions for such loans:
(i) the underwriting standards will be consistent with those
applied to loans to non-affiliates and the terms and conditions
will be the same as those available to an unrelated borrower in a
comparable transaction negotiated at arm's length; (ii) after
making or purchasing a Related Party Loan, the aggregate unpaid
principal balance of all outstanding Related Party Loans shall
not exceed twenty percent (20%) of the MF08 Loan Portfolio; and
(iii) the Manager shall purchase any Related Party Loan if the
borrower is in material default for ninety consecutive days. The
last sentence of this section provides in an unnumbered paragraph
that for "purposes of this Agreement, Investors acknowledge and
agree that a Related Party Loan shall not include . . . (ii) any
loan in which the borrower or co-borrower is a Sponsored
Investment Fund."[6]

The Note Purchase Agreement excludes RE Loans from the
provisions for Related Party Loans. The twenty percent limitation
which is key to the plausibility of the Trustee's knowledge
allegations is not applicable to RE Loans as the quoted sections
above indicate. Accordingly, the Note Purchase Agreement does not
provide a basis from which to draw a plausible inference that
Wells Fargo learned of MF08's financial condition in February
2008 - the predicate from which the Trustee asks the Court to

_____

[6] The definition of "Related Party Loans" in the Offering
Memorandum does not exclude RE Loans as the Note Purchase
Agreement does. However, it lists the same limitations for such
loans as the Note Purchase Agreement does. Offering Memorandum,
p. 9, p. 14. The Note Purchase Agreement is the controlling
document. Offering Memorandum, p. ii, p. 42.

*12-4137 Memo. Decis.*                          -19-

draw a plausible inference that Wells Fargo knew the Manager was breaching its fiduciary duty to MF08 by depleting it of substantially all of its assets.

The Trustee also contends that the Initial Note Sales were "backdated" which indicates Wells Fargo's knowing participation in the alleged wrongdoing. Compl. ¶¶ 52, 54, 56. Wells Fargo responds that the first three transfers were necessarily given effective dates (in March 2008) that differed from the dates the cash was transferred to RE Loans (in December 2007) and the dates merely show RE Loans' intent to give the transfers retroactive effect in connection with restating its quarterly financial statement. Wells Fargo is correct. The Complaint pleads only that Wells Fargo knew the transactions were to be given retroactive treatment to cure RE Loans' default under the Loan Agreement. See Moore v. Comm'r, 93 T.C.M. (CCH) 1275, at *16 (T.C. 2007) (distinguishing between prior oral understanding of effective date and backdating, backdating generally involves an effort to mislead); Viacom Int'l Inc. v. Tandem Prods., Inc., 368 F. Supp. 1264, 1270 (S.D.N.Y. 1974) (noting that when written contract provides it shall be effective "as of" earlier date, it generally is retroactive to the earlier date). While the Complaint repeatedly uses the word "backdated" - probably because as used it has a pejorative connotation - it amounts to nothing more than a conclusory allegation and provides no strength to the Complaint's theories for Wells Fargo's knowledge of wrongdoing.

For the Subsequent Note Sales, the Trustee's knowledge theory rests on a different section of the Note Purchase Agreement and certain language in the Offering Memorandum.

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 20 of 28

Section 5.7(c) of the Note Purchase Agreement provides that MF08 may purchase loans from RE Loans if: (i) the borrower is not in default; (ii) the purchase price does not exceed the unpaid balance of principal, interest and other charges; and (iii) the loan satisfies underwriting criteria customarily applied by MF08 to loans made to or purchased from third parties.

Wells Fargo contends the Complaint does not plausibly allege that Wells Fargo knew that the notes sold to MF08 were in default or plausibly allege that the underlying loans did not satisfy "underwriting criteria customarily applied" by MF08 to other loans.

First, the Court notes that with borrowing base financing, such as the Loan Agreement provided, Wells Fargo may well have known whether the transferred loans were performing or non-performing.[7] But that knowledge is largely irrelevant. The Loan Agreement either permitted or required Wells Fargo to release its lien when a note was sold according to the terms of the Loan Agreement.[8] The fact that Wells Fargo released its lien in order to complete the transfers of the notes does not support the inference of knowledge of breach of fiduciary duty that the Trustee urges. Wells Fargo is correct that there is a difference between knowledge that MF08 may have been breaching the terms of the Note Purchase Agreement with its investors and knowledge that

---

[7] See Loan Agreement definition of "Eligible Notes Receivable" at p. 7 and § 6.2 regarding collateral reporting requirements.

[8] See Loan Agreement § 9.1 governing rights and remedies, and § 4.9(b) providing that Wells Fargo shall release its lien when a note receivable is sold.

*12-4137 Memo. Decis.*                    -21-

the Manager was breaching its fiduciary duty to MF08.

As to the underwriting criteria, the Offering Memorandum states that MF08 "expects to purchase mortgage loans from, or [enter] into co-investment agreements with RE Loans as may be determined by the Manager" and in order to mitigate the conflicts of interest that arise in such transactions, they "will be made in compliance with lending criteria for such loans established by the Note Purchase Agreement." Offering Memorandum, p. 11. The Offering Memorandum then describes "general standards" for the mortgage loans MF08 will own as a "strict set of guidelines" for the quality of the real property security given for the loans - a loan to value ratio of 70% for "improved property" and 50% for "land." Offering Memorandum, p. 12.[9]

Despite this reference to the "lending criteria" to be found in the Note Purchase Agreement, there are none other than the general statements in § 5.7(c)(iii) that a loan purchased from RE Loans will satisfy "the loan underwriting criteria customarily applied by the Company with respect to loans made to or purchased from unrelated third parties" and in § 5.7(e)(i) that a loan to a related party will satisfy the "underwriting standards customarily applied by [MF08] to loans to non-affiliates." The idea that Wells Fargo knew what this vague reference to "underwriting criteria" or "standards" meant and thus knew that the Manager was deviating from it when MF08 bought loans from RE Loans is shaky at best. The "underwriting criteria" - whether

---

[9] The Offering Memorandum also says it is "qualified in its entirety" by the Note Purchase Agreement. Offering Memorandum, p. 42.

Case: 12-04137    Doc# 84    Filed: 02/11/14    Entered: 02/11/14 15:19:16    Page 22 of 28

they are a "guideline" or a "strict standard" do not provide a plausible basis from which to infer Wells Fargo knew of the Manager's breach of fiduciary duty.

The Trustee argues that Wells Fargo is asking the Court to interpret the Note Purchase Agreement and the Loan Agreement which it should not do in the context of a motion to dismiss. According to the Trustee, the Court's task in the present context is not to interpret these documents but to assume the truth of the well plead factual allegations of the Complaint and draw plausible inferences from them. As a general proposition that may be true, but the Court does not need to accept as true conclusory statements, statements of law, and unwarranted inferences cast as factual allegations. <u>Twombly</u>, 550 U.S. at 555-57; <u>Clegg v. Cult Awareness Network</u>, 18 F.3d 752, 754-55 (9th Cir. 1994).

In addition, when a document which the Court may treat as part of the Complaint, contradicts the allegations in the Complaint, the document trumps the allegations in the Complaint. <u>Sprewell v. Golden State Warriors</u>, 266 F.3d 979, 988 (9th Cir. 2001) (factual allegations in arbitration award attached to complaint undermined its 42 U.S.C. § 1981 claim).

While it is generally true that resolution of the disputed meaning of a contract is inappropriate in the context of a motion to dismiss, that rule applies where the language is unclear. Where the language is clear, its interpretation is a question of law and dismissal may be appropriate. See <u>Skilstaf, Inc. v. CVS Caremark Corp.</u>, 669 F.3d 1005, 1017 (9th Cir. 2012) (party's assertion of ambiguity does not require district court to allow additional opportunity to present extrinsic evidence if the court

*12-4137 Memo. Decis.*                    -23-

considers the contract language and the evidence the parties have presented and concludes that the language is reasonably susceptible to only one interpretation); Block v. eBay, Inc., 2012 WL 1601471, at *2 n.3 (N.D. Cal. May 7, 2012) (noting court may resolve contractual claims on a motion to dismiss if the terms of the contract are unambiguous).

The Trustee does not point to any language in the relevant documents that is unclear or ambiguous. Nor does the Trustee acknowledge that the provisions in the Note Purchase Agreement that she relies on for leading to Wells Fargo's knowledge - the 20% limitation, the "underwriting criteria," the related party loan limitations - do not apply. The Note Purchase Agreement and Loan Agreement are not ambiguous and they contradict the essential path used by the Trustee to reach her conclusory allegation that Wells Fargo actually knew the Manager was stripping MF08 of substantially all of its assets and then substantially assisted the Manager. Accordingly, reading the Complaint as a whole, the Court finds it lacks factual allegations from which to draw a plausible inference that Wells Fargo actually knew of MF08's financial condition and actually knew the Manager was causing severe financial harm to MF08 in breach of its fiduciary duties.

### c. Merger of Banks

The Trustee's next theory is based on allegations regarding a 2007 merger of Wells Fargo's parent company with the parent of Mt. Diablo Bank, the bank used by MF08 for two of its bank accounts. The Trustee contends this ownership structure supports an inference that Wells Fargo knew about MF08's financial

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 24 of 28

condition. "As the sole member of and the 100% owner of [Wells Fargo], the knowledge of [Wells Fargo's parent] and its operating subsidiaries is imputed to [Wells Fargo]." Compl. ¶ 14. "As a result [of the merger], Wells Fargo had knowledge of the balances in the MF08 accounts and knew the amount of cash received by MF08 from its inception." Compl. ¶¶ 43, n.22; 51.

The Trustee asks the court to assume Mt. Diablo Bank had actual knowledge of MF08's entire financial condition based on the allegation regarding two MF08 bank accounts, and then impute that knowledge to Wells Fargo's parent and then impute that knowledge to Wells Fargo itself. These allegations are entirely too conclusory and skeletal to support a plausible inference of actual knowledge. Defer LP v. Raymond James Financial, Inc., 654 F. Supp. 2d 204, 218 (S.D.N.Y. 2009) (court refuses to aggregate knowledge of two or more corporate entities on basis of shared parent and nothing more). In the context of this case, these allegations fail to support a plausible inference of actual knowledge.

## 2. Substantial Assistance

Wells Fargo contends that the Complaint is devoid of plausible allegations that it provided substantial assistance to the Manager in accomplishing its wrongdoing, an independent reason to grant its Motion to Dismiss.

To plead substantial assistance, the Complaint must contain facts from which the Court may reasonably infer that Wells Fargo's conduct was a substantial factor in bringing about the injury allegedly suffered by MF08. Neilson, 290 F. Supp. 2d at 1129. While Rule 9(b) permits knowledge to be alleged generally,

Case: 12-04137   Doc# 84   Filed: 02/11/14   Entered: 02/11/14 15:19:16   Page 25 of 28

substantial assistance must be alleged with particularity. <u>Dexia</u>
<u>Holdings, Inc. v. Countrywide Financial Corp.</u>, 2012 WL 1798997,
*6 (C.D. Cal. 2012).

The alleged injury is the Manager's transfer of
substantially all of MF08's assets to RE Loans. The alleged
assistance given by Wells Fargo was releasing its liens in early
2008 for the Initial Note Sales to cure what was a default under
the Loan Agreement and thereafter releasing its liens for the
Subsequent Note Sales. Compl. ¶¶ 51-56, 70-74, 84. The Trustee
argues that the Complaint sufficiently pleads substantial
assistance because without Wells Fargo's active participation,
those transactions could not have occurred.

"Ordinary business transactions" may provide substantial
assistance if the defendant knows those transactions are
assisting the commission of a specific tort. <u>Casey</u>, 127 Cal. App.
4th at 1145. Opening accounts and approving transfers, even where
there is a suspicion of fraudulent activity, does not amount to
substantial assistance. <u>Consolidated Meridian Funds</u>, 485 B.R. at
624.

Wells Fargo argues that provisions of its Loan Agreement
*permitted* it to release its liens for the Initial Note Sales
(§ 7.13, § 9.1), and *required* it to release its liens for the
Subsequent Note Sales (§ 4.9(b)). In addition, as a result of
these transfers, MF08 became the owner of real estate secured
notes in exchange for making unsecured loans to RE Loans - an
arguable improvement in position rather than a cause of injury.

Wells Fargo's ministerial actions in releasing its liens and
executing reassignments of its collateral do not amount to

*12-4137 Memo. Decis.*                    -26-

substantial assistance as a matter of law. Wells Fargo owed no duty to MF08 or the Manager and its relationship with RE Loans was governed by its Loan Agreement. See Sharp, 403 F.3d at 52 (bank's forbearance and contractually required consent were not substantial assistance or participation in borrower's principal's fraud; bank owed no independent duty and its silence and forbearance were not affirmative assistance); Casey, 127 Cal. App. 4th at 1147 (approving approach taken in Sharp, noting under California law banks had no duty to inform on suspicious customers).

As previously discussed, taking all well pleaded facts in the Complaint as true, the Complaint does not plausibly allege that Wells Fargo actually knew the Manager was breaching its fiduciary duty to MF08. The Complaint also fails to plausibly allege that Wells Fargo provided substantial assistance to the Manager. Wells Fargo was a secured lender to RE Loans; it had no obligation to declare RE Loans in default as the Trustee suggests, and it owed no duty to MF08 or its investors. Wells Fargo did not provide substantial assistance to the Manager as required for the aiding and abetting claim to survive.

**III. CONCLUSION**

For the reasons explained above, the Court grants Wells Fargo's Motion to Dismiss without leave to amend and will enter an order so providing.

*12-4137 Memo. Decis.*                    -27-

1    **<u>Court Service List</u>:**

2    All parties by ecf

*12-4137 Memo. Decis.*                    -28-